# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

FLORIDA DEMOCRATIC PARTY, AND
THE DEMOCRATIC NATIONAL COMMITTEE,

      *Plaintiffs*,

v.                            Case No. 4:16cv607-MW/CAS

KEN DETZNER, IN HIS OFFICIAL CAPACITY AS
FLORIDA SECRETARY OF STATE,

      *Defendant.*

_____/

## ORDER GRANTING PRELIMINARY INJUNCTION[1]

"At the root of the present controversy is the right to vote—a 'fundamental political right' that is 'preservative of all rights.'" *Williams v. Rhodes*, 393 U.S. 23, 38 (1968) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)). Voting is a "precious" and "fundamental" right. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966). By definition, that right includes "the right of qualified voters within a state to cast their ballots and *have them counted* .

---

[1] This Court recognizes that time is of the essence inasmuch as the supervisors of elections have received thousands of vote-by-mail ballots.   Moreover, this Court wishes to afford the parties a meaningful opportunity to file an appeal. Accordingly, this order issues on an expedited basis.

. . .” *United States v. Classic*, 313 U.S. 299, 315 (1941) (emphasis added).

This is a case about vote-by-mail ballots. For years, the State of Florida has consistently chipped away at the right to vote. It limits the time allotted to register to vote to the greatest extent permissible under federal law. *See* 52 U.S.C. § 20507(a)(1) (2012) (requiring each state to allow voters to register, at a minimum, up to thirty days prior to Election Day); § 97.055(1)(a), Fla. Stat. (2016) (closing the Florida voter registration books twenty-nine days prior to Election Day). It limits the methods for voter registration. *See* § 97.053, Fla. Stat. (2016) (disallowing online voter registration and same-day registration on Election Day). It limits the number of early voting days. *See id.* § 101.657 (allowing only seven days for early voting). This is just a sampling.

In light of those limitations, many Florida voters choose to vote by mail. And that option has become increasingly popular in recent years—six percent more voters cast vote-by-mail ballots in the 2012 General Election than the 2008 General Election. ECF No. 3, at 8–9. What vote-by-mail voters likely do not know, however, is that their vote may not be counted. In Florida, if a voter's

signature on a vote-by-mail ballot does not match the signature on file with the supervisor of elections office then the ballot is declared "illegal" and their vote is not counted. Moreover, that voter only receives notice that their vote was not counted *after* the election has come and gone and, further, is provided no opportunity to cure that defect. On the other hand, if a vote-by-mail voter doesn't bother to sign the ballot in the first place, that voter is immediately notified and provided an opportunity to cure.

The issue in this case is whether Florida's statutory scheme, which provides an opportunity to cure no-signature ballots yet denies that same opportunity for mismatched-signature ballots, is legally tenable. The answer is a resounding "no."

I

Like many states, Florida allows its registered eligible voters, without an excuse, to cast their ballots by mail (as opposed to casting their votes at their assigned precinct on Election Day). § 101.62, Fla. Stat. (2016). And that option is becoming more and more popular—2.37 million vote-by-mail ballots were submitted in the 2012 General Election, and even more are expected for the 2016 General Election. ECF No. 4, at 3. Those voters who opt to

3

vote by mail have to jump through a few simple administrative hoops. For example, vote-by-mail voters must send their ballot back in a specially marked secrecy envelope. § 101.65, Fla. Stat. (2016). Those voters also must insert that envelope in another mailing envelope, seal that mailing envelope, and fill out the "Voter's Certificate" on the back of the mailing envelope. *Id.*

A different requirement lies at the heart of this case. For a vote-by-mail ballot to be counted, the envelope of that ballot must include the voter's signature. *Id.* Once the vote-by-mail ballots are received, county canvassing boards review those ballots to verify that the signature requirement has been met. If the vote-by-mail ballot lacks the voter's signature, it is considered an "illegal" ballot and "will not be counted." *Id.* But the would-be-voter has an opportunity to cure that "no-signature" ballot and cast an effective vote in the same election cycle until 5:00 p.m. the day before an election by "complet[ing] and submit[ting] an affidavit in order to cure the unsigned vote-by-mail ballot." *Id.* § 101.68(4)(b). That affidavit must be accompanied by one of the enumerated identification forms and then mailed, faxed, e-mailed, or delivered in person to the applicable county supervisor of elections. *Id.* § 101.68(4)(d). As

4

explained by Leon County Supervisor of Elections Ion Sancho, the affidavit is issued by the Florida Secretary of State's office. The specific instructions for each individual supervisor of elections, however, are listed on their individual websites, along with the state-issued affidavit and any necessary contact information. *Id.* § 101.68(4)(d)(5)(e).

But the county canvassing boards do not just review the vote-by-mail ballots to verify that they are *actually* signed; they also compare those signatures to voters' signatures submitted in the registration process. *Id.* § 101.68(2)(c)(1). These county canvassing boards are staffed by laypersons that are not required to undergo—and many do not participate in—formal handwriting-analysis education or training.[2] If the canvassing board believes that the signature on the vote-by-mail ballot does not correspond to the signature on file with the supervisor of elections office, the ballot is deemed "illegal" and is therefore rejected. *Id.* § 101.65 ("A vote-by-mail ballot will be considered illegal and not be counted if

---

[2] The canvassing boards consist of "the [local] supervisor of elections; a county court judge, who shall act as chair; and the chair of the board of county commissioners." § 102.141, Fla. Stat. (2016). Substitute members can be appointed as necessary. *Id.*

5

the signature on the voter's certificate does not match the signature on record.").[3] In other words, the vote does not count. When that occurs, the local supervisor of elections will mail a new registration application to the voter after the election, "indicating the elector's current signature." *Id.* § 101.68.

Prior to 2004, the same opportunity to cure was provided to "mismatched-signature" voters and no-signature voters. But that is no longer the case.[4] Rather, unlike the "no-signature" voters, those would-be-voters who, in fact, comply with Florida law and sign their ballot appropriately do not have an opportunity to cure before the election is over.[5] That is because, although those would-

---

[3] It bears noting that handwriting experts are often challenged under *Daubert*. There is no way that any member of a canvassing board could survive a *Daubert* challenge yet the State of Florida empowers them to declare ballots illegal.

[4] The tortured history of this statute is quite complicated. Prior to 2004, the procedures for curing vote-by-mail ballots varied from county to county. In 2004, the Florida legislature enacted a statute that rejected all mismatched-signature ballots and no-signature ballots without an opportunity to cure. Fla. H.R. Comm. on Ethics & Elections, Bill CS/HB 7013 (2013) Staff Analysis 1, 5. In 2013, the Florida legislature amended that statute to allow no-signature ballots to be cured but did not provide that same opportunity for mismatched-signature ballots. Ch. 2013-57, § 101.68, Laws of Fla. That amendment took effect in 2014. *Id.*

[5] It is true that voter signatures may be updated "at any time using a voter registration application submitted to a voter registration official." §98.077, Fla. Stat. (2016). That option, however, is effectively foreclosed for mismatched-signature voters. For those updated signatures to be effective in the immediate election, they must be submitted prior to the canvass. *Id.* § 101.68. But because mismatched-signature ballots are necessarily rejected

be-voters have an opportunity to update their registration signatures, that opportunity is too late for those votes to be counted in the same election cycle. Instead, the updated signature can only be used in future election cycles.

Furthermore, the State of Florida has no formalized statewide procedure for canvassing boards to evaluate whether the signature on a vote-by-mail ballot matches the signature on file with the elections office. And the procedures in place vary widely by county. ECF No. 4, at 7–9. As a result of these varied procedures, the number of mismatched-signature ballots that are rejected *also* varies widely by county. *See* ECF No. 3-3, at 30. In the 2012 General Election, for example, Pinellas County rejected approximately .25% of all vote-by-mail ballots cast, while Broward County rejected close to 1.5%. *Id.*

To help understand some of these differences, this Court called Ion Sancho, Leon County Supervisor of Elections, as a court witness pursuant to Federal Rule of Evidence 614(b). He explained

---

*during* the canvass, that option is not available. Rather, in any given election, those voters only receive notification as to their vote's rejection after their only opportunity to update their signature for that election cycle has come and gone.

that some counties go above and beyond that required under Florida law to make sure that all Florida citizens have a fair opportunity to vote and have their votes counted. Leon County, for example, will go so far as to call or email no-signature voters to make sure that they have notice as to their voting deficiency. He also explained that vote-by-mail ballots submitted in Leon County are first reviewed by a computer software. If the computerized comparison raises any issues, then a human inspection of that signature is conducted. If the elections staff is still unable to ascertain the validity of that signature, then the signature is brought before the canvassing board for adjudication. While that procedure is crucial in larger counties, Supervisor Sancho testified that it is not necessary (and, to his knowledge, is not used) in rural counties. In fact, financial limitations may make it unfeasible to conduct that exhaustive of a review in those smaller counties. Even though these procedures vary from county to county, Supervisor Sancho testified that he and two other supervisors of elections agree that there is no reason why mismatched-signature ballots cannot be

treated the same as no-signature ballots during the review (and cure) process.[6]

Plaintiffs brought this case arguing that Florida's vote-by-mail procedures unconstitutionally burden the rights of Florida's mismatched-signature voters. Specifically, Plaintiffs seek an injunction enjoining Defendants and anyone under their supervision from rejecting mismatched-signature ballots without first affording those voters an opportunity to cure in the same election cycle. ECF No. 4, at 25.[7]

---

[6] Defendant objected to portions of Supervisor Sancho's testimony on hearsay grounds. But "[a]t the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)). For those same reasons, Defendant's objections to Plaintiffs' evidence are also denied. ECF No. 25. That evidence was therefore considered by this Court.

[7] This Court has not held a hearing on this matter. Under Rule 65, an evidentiary hearing is not required "where the material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought . . . ." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1313 (11th Cir. 1998) (citations omitted). Because Defendant Detzner only raised jurisdictional arguments, no material facts are in dispute and this Court may (and does) address the matter solely on the papers. *See* ECF No. 30 (cancelling hearing).

II

Before this Court reaches the merits, a few housekeeping matters must be addressed.

The first is standing, "as it is a threshold matter required for a claim to be considered by the federal courts." *Via Mat Int'l S. Am. Ltd. v. United States*, 446 F.3d 1258, 1262 (11th Cir. 2006). Associations or organizations, in certain scenarios, have standing to assert claims based on injuries to itself or its members if that organization or its members are affected in a tangible way. *See United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544 (1996). More specifically, organizations can "enforce the rights of its members 'when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Arcia v. Fl. Sec'y of State*, 772 F.3d

1335, 1342 (11th Cir. 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).

As one of my colleagues held in another election case, political parties have standing to assert, at least, the rights of its members who will vote in an upcoming election. *Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1078–79 (N.D. Fla. 2004) (Hinkle, J.). That was so even though the political party could not identify *specific* voters that would be affected; it is sufficient that some inevitably would. Here too, Plaintiffs need not identify *specific* voters that are registered as Democrats that will have their vote-by-mail ballot rejected due to apparent mismatched signatures; it is sufficient that some inevitably will. In fact, because mismatched-signature voters do not receive notice that their vote was rejected until after the election, this Court cannot imagine who would have standing save such organizations. Plaintiffs thus have standing.

Second, this Court must address whether Defendant is the proper party to be sued in this case. It is well-established that while a state may not be sued unless it waives its sovereign immunity or that immunity is abrogated by Congress, *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000), a suit alleging a constitutional

11

violation against a state official in his official capacity for prospec-
tive injunctive relief is not a suit against the state and, therefore,
does not violate the Eleventh Amendment, *Ex Parte Young*, 209
U.S. 123, 161 (1908). That is because "[a] state official is subject to
suit in his official capacity when his office imbues him with the
responsibility to enforce the law or laws at issue in the suit." *Griz-
zle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011).

Here, Plaintiffs seek prospective injunctive relief against the
Secretary of State in his official capacity. Defendant Detzner none-
theless argues that he cannot direct the canvassing boards to com-
ply with any order issued by this Court. ECF No. 28, at 6. That is,
Defendant Detzner asserts that Florida law does not allow him to
grant the sort of directive that would be required here. *See* ECF
No. 29, at 13.

This is, at best, disingenuous. As noted by Plaintiffs in their
reply, ECF No. 33, at 2, Florida law, on its face, establishes that,
as Secretary of State, Defendant Detzner is the "chief election of-
ficer" for the State of Florida, § 97.012, Fla. Stat. (2016). And as
head of the Department of State, the "general supervision and ad-
ministration of the election laws" in Florida are his responsibility.

12

*Id.* §§ 15.13, 20.10. Florida law therefore vests Defendant Detzner with the authority to "adopt by rule uniform standards" for the "interpretation and implementation of" the Florida Election Code (specifically, "chapters 97-102 and chapter 105"), *id.* § 97.012(1); "[p]rovide written direction and opinions to the supervisors of elections" regarding their duties under Florida's election laws, *id.* § 97.012(16); and bring actions to "enforce compliance" with those laws, *id.* § 97.012(14). This isn't some recent invention either. The Secretary of State has held this power for the last ten years. *See* Ch. 2005-278, § 97.012, Laws of Fla. (codifying the pertinent changes to § 97.012 in 2005).

Defendant Detzner nonetheless attempts to distinguish *Grizzle* by arguing that, unlike Georgia's Secretary of State, he does not possess the power to issue orders directing compliance with Florida's election laws. But that is simply not the case. The Secretary of State has previously exercised this precise power under § 97.012(16) to order the supervisors of elections to perform specific duties. *See, e.g.*, App. I, at 2. Where those directives are not followed, section 97.012(14), Florida Statutes, provides an enforcement mechanism that only the Secretary of State can wield.

13

Further, just last week, this Court ordered Defendant to direct the supervisors of elections to extend the voter registration deadline in light of Hurricane Matthew. *See Fla. Democratic Party v. Scott, et al.*, Case No. 4:16-cv-626-MW/CAS (N.D. Fla. Oct. 10, 2016). Twice. And, by every appearance, he did so. Twice.  Nonetheless, Defendant Detzner still argues that he does not have the authority to issue the same kind of directive that he did last week.[8] Sometimes actions speak louder than words.

Finally, this Court emphasizes that it is not being asked to order Defendant Detzner to direct the individual supervisors of elections to implement specific procedures (which are ordinarily discretionary) in terms of when to meet, how often to meet, or how to evaluate signatures. Defendant's defense would have more merit if that were the case. *See* ECF No. 29, at 10 ("The canvassing boards and local supervisors of elections, not the Secretary, have the final authority with respect to the signature comparison mandated by the statute."). Rather, this Court is simply asked to order Defendant to issue a directive, as he is empowered to do, copying

---

[8] Defendant Detzner attempts to distinguish *Fla. Democratic Party* and, by extension, *Grizzle*, by asserting that his authority is not as inclusive as that exercised by the Georgia Secretary of State. But given this Court's analysis of § 97.012, it disagrees. *Grizzle* is therefore indistinguishable.

14

the supervisors with this Order, explaining that a court has declared the existing statutory structure constitutionally impaired, and direct the supervisors of elections and canvassing boards to provide the same opportunity to cure mismatched-signature ballots as no-signature ballots and to follow precisely the same procedure. Because "[h]is power by virtue of his office sufficiently connect[s] him with the duty of enforc[ing]" the election laws, *Ex Parte Young*, 209 U.S. at 161, he is a proper party here, *cf. Grizzle*, 634 F.3d at 319 (holding that Georgia Secretary of State was proper party in voting case). In short, Defendant is the proper party.

### III

Under Rule 65 of the Federal Rules of Civil Procedure, a district court may grant a preliminary injunction "only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir.

2000) (en banc). Although a "preliminary injunction is an extraordinary and drastic remedy," it nonetheless should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Authority v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974)). None of these elements, however, is controlling; rather, this Court must consider the elements jointly, and a strong showing of one element may compensate for a weaker showing of another. *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979).[9]

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). State and local laws that unconstitutionally burden that right are impermissible. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 42, 41 (2008).

---

[9] Decisions of the Fifth Circuit prior to October 1, 1981, are binding within the Eleventh Circuit. *Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

But that does not mean the right to vote is absolute. Rather, states retain the power to regulate their own elections. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citations omitted). Election laws almost always burden the right to vote. *See id.* ("Election laws will invariably impose some burden upon individual voters."). Some of these regulations must be substantial to ensure that order rather than chaos accompanies our democratic process. *Id.*

Not every voting regulation, however, is subject to strict scrutiny. Rather, courts considering a challenge to state election laws "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"[10] *Id.* at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780,

---

[10] The Supreme Court has consistently held that the right to vote is analyzed under equal protection. So, this Court does so. But, left to its own devices, this Court would hold that the right to vote is a fundamental right subject to substantive due process analysis and should always be subject to strict scrutiny. *See, e.g.*, Terry Smith, *Autonomy versus Equality: Voting Rights Rediscovered*, 57 Ala. L. Rev. 261, 266 (2005) ("A continuing lamentation of scholars of voting is the failure of the Court to locate the right to vote within the contours of substantive due process rather than equal protection.").

789 (1983)). "This standard is sufficiently flexible to accommodate the complexities of state election regulations while also protecting the fundamental importance of the right to vote." *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012). When voting rights are subjected to "severe" restrictions, the regulation at issue "must be 'narrowly drawn to advance a compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). If the right to vote is not burdened at all, then rational basis review applies. *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012). But in the majority of cases where voting rights are subject to less-severe burdens, the State's interests often—but not always—are sufficient to justify the restrictions. *Anderson*, 460 U.S. at 788. In those cases, "[h]owever slight the burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (quotation omitted).

Defendants raised no defense on the merits (perhaps that is because Florida's statutory scheme is indefensible). This Court

nonetheless addresses the merits. During this election cycle, millions of voters across the state will march happily to their mailbox and attempt to exercise their fundamental right to vote by mailing their vote-by-mail ballot. After the election, thousands of those same voters—through no fault of their own and without any notice or opportunity to cure—will learn that their vote was not counted. If disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then this Court is at a loss as to what does.[11] *See Stewart v. Blackwell*, 444 F.3d 843, 869 (6th Cir. 2006) (holding that the right to vote was severely burden where thousands of votes were not counted due to unreliable voting equipment).

As a severe burden, Florida's statutory scheme may survive only if it passes strict scrutiny. This Court does not question that

---

[11] One could (attempt to) argue that Florida's statutory scheme does not amount to a severe burden because it does not affect a large percentage of Florida voters. And that argument would fail. It affected approximately *23,000* in the last election cycle. ECF No. 3-3, at 29. In the 2000 General Election, President George W. Bush won Florida (and the election) by a mere 537 votes. *2000 Official Presidential General Election Results*, FEC (Dec. 2001), http://www.fec.gov/pubrec/2000presgeresults.htm. Not only is Florida's statutory scheme a severe burden on the right to vote, *cf. Ne. Ohio Coal. For the Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) (holding that disqualifying thousands of votes because they were cast in the right polling location but wrong precinct was a "substantial" burden on the right to vote), it affects enough votes to change the election results and, by extension, our country's future.

preventing voter fraud is a compelling interest. *See Crawford, et al., v. Marion Cnty. Election Bd.*, 553 U.S. 181, 225 (2008) ("There is no denying the abstract importance, the compelling nature, of combating voter fraud."); *see also Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989) ("A state indisputably has a compelling interest in preserving the integrity of its election process."). That interest just has no rational relationship (let alone narrow tailoring) to Florida's statutory scheme. There is simply no evidence that these mismatched-signature ballots were submitted fraudulently. Rather, the record shows that innocent factors—such as body position, writing surface, and noise—affect the accuracy of one's signature.

But even assuming the evidence established that voter fraud ran rampant, that would not be determinative. Again, at issue is not the accuracy of each individual county canvassing board's review process; it is that Florida denies mismatched-signature voters the opportunity to cure. Indeed, this Court is not being asked to order that *any* specific vote be counted, let alone those that are fraudulent. Rather, this Court is simply being asked to require that mismatched-signature voters have the same opportunity to

20

cure as no-signature voters. In fact, letting mismatched-signature voters cure their vote by proving their identity *further* prevents voter fraud—it allows supervisors of elections to confirm the identity of that voter before their vote is counted.

Defendant could also have asserted (but did not) a compelling interest in administrative convenience. But the evidence in this case, again, would have foreclosed that argument. To be fair, this Court elicited testimony that at least one supervisor of elections expressed concern that providing an opportunity to cure mismatched-signature ballots would impose an administrative inconvenience on their staff. But that testimony is the only evidence supporting that contention. In fact, two other supervisors of elections—one from a large county, and one from a small county—disagreed and explained that it would "not [be] a problem" to allow mismatched-signature ballots the same opportunity to cure that no-signature ballots enjoy. Finally, even assuming that it *would* be an administrative inconvenience—and the evidence shows it is not—that interest cannot justify stripping Florida voters of their fundamental right to vote and to have their votes counted. *See Tay-*

*lor v. Louisiana*, 419 U.S. 522, 535 (1975) (explaining that "administrative convenience" cannot justify the deprivation of a constitutional right).

Finally, making matters worse is that canvassing boards across the state employ a litany of procedures when comparing signatures. Rather than enumerating specific procedures for comparing signatures, the Florida legislature "left it to the canvassing boards to make determinations using their collective best judgment as to what constitutes a signature match." ECF No. 3-3, 50 n.1. The result is a crazy quilt of conflicting and diverging procedures. And this Court is deeply troubled by that complete lack of uniformity. But this Court need not—and does not—address that hodgepodge of procedures.

Even assuming that some lesser level of scrutiny applied (which it does not), Florida's statutory scheme would still be unconstitutional. It is illogical, irrational, and patently bizarre for the State of Florida to withhold the opportunity to cure from mismatched-signature voters while providing that same opportunity to no-signature voters. And in doing so, the State of Florida has categorically disenfranchised thousands of voters arguably for no

reason other than they have poor handwriting or their handwriting has changed over time. Thus, Florida's statutory scheme does not even survive rational basis review.

As explained above, in addition to the likelihood of success on the merits, three other factors influence the propriety of a preliminary injunction: whether "irreparable injury will be suffered unless the injunction issues," whether "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party," and whether "if issued, the injunction would not be adverse to the public interest." *Siegel*, 234 F.3d at 1176.

Plaintiffs and their members will undoubtedly suffer irreparable injury absent a preliminary injunction. *See, e.g.*, *Obama for Am.*, 697 F.3d at 436 (finding irreparable injury because irreparable injury is presumed when "[a] restriction on the fundamental right to vote" is at issue). This is not a case where failing to grant the requested relief would be a mere inconvenience to Plaintiffs and their members. Rather, thousands of mismatched-signature voters, arguably through no fault of their own, will have their ballots declared "illegal" by canvassing boards—whose members, I

might add, lack any formal handwriting-comparison training or education—without the opportunity to prove they are who they say they are. Those voters are therefore robbed of one of our most basic and cherished liberties; namely, the right to vote and have that vote counted. *See Louisiana v. United States*, 380 U.S. 145, 153 (1965) ("The cherished right of people in a country like ours to vote cannot be obliterated by the use of laws like this, which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar."). As this Court explained in another recent case about the upcoming election, "This isn't golf: there are no mulligans." *Scott*, Case No. 4:16-cv-626-MW/CAS, at 13. Once the canvassing starts and the election comes and goes, "there can be no do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

Similarly, the balance of hardships favors Plaintiffs. The State of Florida has the ability to set its own election procedures (so long as they comply with federal law). That is without question. Some of those procedures promote administrative convenience and efficiency. *See, e.g.*, § 99.095, Fla. Stat. (2016) (requiring persons running for certain offices to either pay a qualifying fee or obtain

signatures of 1% of the total number of registered voters, divided by the number of districts involved in that office). But there is no rational explanation for why it would impose a severe hardship on Defendant to provide the same procedure for curing mismatched-signature ballots as for no-signature ballots. In fact, prior to 2004, before the Florida Legislature outlawed the practice, voters had the ability to cure both mismatched-signature ballots and no-signature ballots. And, as testified by Supervisor Sancho, that method was highly effective.

In 2013, with yet another reversal, the Florida Legislature made it so that no-signature ballots could be cured in a simple and effective manner. *Id.* § 101.68. There is no reason that same procedure cannot be implemented (rather, re-implemented) for mismatched-signature ballots. Any potential hardship imposed by providing the same opportunity—and comfort—for mismatched-signature voters pales in comparison to that imposed by unconstitutionally depriving those voters of their right to vote and to have their votes counted.

Finally, the injunction is in the public interest. The Constitution guarantees the right of voters "to cast their ballots and *have*

*them counted . . . .*" *Classic*, 313 U.S. at 315 (emphasis added); *see also Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 234 (6th Cir. 2011) ("Thus, we have held that '[t]he right to vote includes the right to have one's votes counted on equal terms with others." (quoting *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008))). Florida's statutory scheme, however, threatens that right by subjecting vote-by-mail voters to an unreasonable risk that their ballot will be tossed without any opportunity to cure, let alone any form of notice. By doing so, Florida has cemented an unconstitutional obstacle to the right to vote and has thus struck "at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). The public interest is not served by depriving vote-by-mail voters of an opportunity to cure when that opportunity is already available for no-signature voters. In fact, it is just the opposite.

## IV

This Order requires Plaintiffs to give security for costs in a modest amount; namely, $500.00. Any party may move at any time to adjust the amount of security.

V

Stays pending appeal are governed by a four-part test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Venues Lines Agency v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000) (applying the same test). Considering that this test is so similar to that applied when considering a preliminary injunction, courts rarely stay a preliminary injunction pending appeal. That rings true here. Because no exceptional circumstances justify staying this Order pending appeal, *see Brenner v. Scott*, 999 F. Supp. 2d 1278, 1292 (N.D. Fla. 2014) (Hinkle, J.) (issuing a rare stay of a preliminary injunction given the public interest in stable marriage laws across the country), this Court refuses to do so.

VI

Once again, at the end of the day, this case is about the precious and fundamental right to vote and to have one's vote

27

counted. In our democracy, those who vote decide everything; those who count the vote decide nothing.[12] Justice Stewart once quipped, in reference to pornography, "I know it when I see it . . ." *Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring). Likewise, this Court knows disenfranchisement when it sees it and it is obscene.

Accordingly,

**IT IS ORDERED:**

1. Plaintiffs' Motion for Preliminary Injunction, ECF No. 1, is **GRANTED**. Defendant's Motion to Dismiss, ECF No. 29, is **DENIED**.

2. Defendant Detzner is ordered to issue a directive to the supervisors of elections (with this Order attached) advising them (1) that Florida's statutory scheme as it relates to mismatched-signature ballots is unconstitutional; and (2) that in light of this Court's order they are required to

---

[12] An infamous world leader disagreed. *See* Herma Percy, Ph. D., *Will Your Vote Count? Fixing America's Broken Electoral System* 43 (2009) ("'Those who cast the votes decide nothing. Those who count the votes decide everything.' Joseph Stalin, Communist Dictator").

allow mismatched-signature ballots to be cured in precisely the same fashion as currently provided for non-signature ballots. For example, the supervisors of elections must provide the same notice, *see* § 101.68(4)(a), Fla. Stat. (2016) ("The supervisor of elections shall, on behalf of the county canvassing board, notify each elector whose ballot was rejected as illegal and provide the specific reason the ballot was rejected . . . ."), the same process, *see id.* § 101.68(4)(d)(5)(e) (outlining the required process), and must allow mismatched-signature ballots to be cured up to the same date and time as currently done for no-signature ballots, *id.* § 101.68(4)(b) (allowing to cure until 5:00 p.m. the day before the election). The difference is that a separate form must be used. Accordingly, Defendant Detzner is required to submit the attached affidavit, *see* App. II, in his directive to the supervisors of elections and require them to provide that form for mismatched-signature voters to cure their ballots (with "DRAFT" removed, of course).

3. The preliminary injunction set out above will take effect upon the posting of security in the amount of $500 for

costs and damages sustained by a party found to have been wrongfully enjoined. Plaintiff will immediately notify Defendant when the bond has been posted and thereafter immediately file proof of such notice through the electronic case files system.

4. Likewise, upon receipt of the notice of the posting of security, Defendant shall notify this Court whether he intends to comply with this Order by filing a notice through the electronic case files system on or before 5:00 p.m. on October 17, 2016. If Defendant declares that he intends to flout this Order then this Court will take the appropriate action.

**SO ORDERED on October 16, 2016.**

> **s/Mark E. Walker**
> **United States District Judge**

# APPENDIX I



## FLORIDA DEPARTMENT of STATE

**RICK SCOTT**
Governor

**KEN DETZNER**
Secretary of State

## MEMORANDUM

**FROM:**   Ken Detzner
Florida Secretary of State

**TO:**   Supervisors of Elections

**DATE:**   August 14, 2015

**SUBJECT:**   Directive 2015-02—State Senate Candidate Qualifying;
Year of Apportionment

---

Supervisors of elections have asked for clarification regarding whether the 2016 election is to be deemed to occur in a "year of apportionment" as that term is used in connection with qualifying requirements for state senate candidates in Florida. Their question arises within the context of the recent consent order issued by the circuit court in Leon County requiring the redrawing of state senate district boundaries. *See League of Women Voters of Fla. et al. v. Detzner et al.*, Case No. 2012-CA-2842, Stipulation and Consent Judgment (Fla. 2d Jud. Cir. July 28, 2015)

In an apportionment year, the qualification requirements for a state senate candidate change in two significant ways. First, such a candidate may obtain signatures from electors who reside anywhere in the state (rather than from only those who reside within the district). *See* § 99.09651(3), Fla. Stat. Second, there is a different formula for calculating the minimum number of signatures required to qualify by petition. *See* § 99.09651(1), (2), Fla. Stat. These different requirements reflect the fact that the timing of redrawing of district boundaries conflicts with the ordinary process of identifying which and how many voters within a district would be required to qualify by petition. Redistricting also creates a period of uncertainty for a candidate trying to decide which specifically numbered district he or she might seek to represent, especially in light of the fact that any state senate district that is redrawn, regardless of district number, must be on the ballot in the next general election.

The consent order that the circuit court recently entered directs the Legislature to submit "a remedial apportionment plan" for state senate districts by November 9, 2015. The Legislature



R. A. Gray Building  •  500 South Bronough Street  •  Tallahassee, Florida  32399
Telephone:  (850) 245-6500  •  Facsimile:  (850) 245-6125   www.dos.state.fl.us
*Commemorating 500 years of Florida history*   www.fla500.com



has indicated its intent to convene for a special session in October 2015 to adopt that plan. In turn, while state senate candidates seeking 2016 ballot placement will be running for office based on newly drawn district lines, such candidates may not know in a sufficiently timely manner from which voters they may obtain petition signatures or how many signatures they must obtain. Therefore, I conclude that the provisions in the Election Code referring to procedures to be followed in a "year of apportionment" apply to state senate candidates for the purpose of qualifying in such races in Florida during the 2016 election cycle. *See* §§ 99.095, 99.09651, Fla. Stat.

In turn, pursuant to my authority under section 97.012(1) and (16), Florida Statutes, I hereby direct the supervisors of elections in Florida to perform the duty of verifying signatures on petitions submitted to them by state Senate candidates pursuant to section 99.095(3), Florida Statutes, to determine whether a petition's signature is from a voter registered within the county in which it was circulated. The petitions must state that the candidate is seeking the office of state senator, but they shall not include a district number, *see* § 99.09651(4), Fla. Stat.; however, if a petition includes a district number, the district designation may be disregarded as extraneous and unnecessary information for the applicable qualifying period.

Any state senate candidate in Florida seeking ballot placement for the 2016 election who seeks to qualify by the petition process may obtain signatures "from any registered voter in Florida regardless of party affiliation or district boundaries." *See* § 99.09651(3), Fla. Stat. Moreover, such a candidate will need to collect 1,552 signatures. *See* § 99.09651(1), (2), Fla. Stat. (requiring a candidate for state senate in an apportionment year to collect a number of signatures equal to one-third of one percent of the "ideal population," which is a number calculated by taking the total state population based on the most recent decennial census (18,801,310 in 2010) and dividing by the number of state senators in Florida (40)).

This directive remains in effect until such time as it is superseded or revoked by subsequent directive, law, or final court order.

2

# APPENDIX II

## SIGNATURE CURE AFFIDAVIT FOR VOTE-BY-MAIL BALLOT
(The affidavit is for use by a voter who returns a vote-by-mail ballot with a signature issue on their Voter's Certificate)

### 1. INSTRUCTIONS

Use the following checklist to complete and return this form to the Leon County Supervisor of Elections Office *no later than 5 p.m. on the Monday before the election.*

☐ **Complete and sign the affidavit below; AND**

☐ **Include a copy of one of the following forms of identification (ID) that shows your name and photograph (if the affidavit is not submitted in person):**

Identification that includes your name and photograph: Florida Drivers license; Florida ID; United States passport; debit or credit card; military identification; student identification; retirement center identification; neighborhood association identification; public assistance identification; veteran health identification card issued by the United States Department of Veterans Affairs; a Florida license to carry a concealed weapon or firearm; or an employee identification card issued by any branch, department, agency, or entity of the Federal Government, the state, a county, or a municipality.

**OR**

Identification that shows your name and current residence address: current utility bill, bank statement, government check, paycheck, or government document (excluding voter information card).

Return this completed affidavit **and** the copy of your identification documents to the Supervisor of Elections *no later than 5 p.m. on the Monday before the election:*

- Deliver to our office or to an Early Voting site (by you or another person)
- Mail them to us using the included postage paid return envelope.
- Fax (850-606-8601) or email (vote@leoncountyfl.gov) to our office.

Contact us if you have any questions at 850-606-8683

### 2. VOTE-BY-MAIL BALLOT AFFIDAVIT

I,_____, am a qualified voter in this election and
(Print voter's name)
registered voter of Leon County, Florida. I do solemnly swear or affirm that:
I requested and returned the vote-by-mail ballot and that I have not and will not vote more than one ballot in this election. I understand that if I commit or attempt any fraud in connection with voting, vote a fraudulent ballot, or vote more than once in an election, I may be convicted of a felony of the third degree and fined up to $5,000 and imprisoned for up to 5 years. I understand that my failure to sign this affidavit means that my vote-by-mail ballot will be invalidated.

_____
(Voter's Signature)

_____
(Voter's Address)